Ramsey v. Adams.

---

### No. 27,109.

G. L. RAMSEY, *Appellant* and *Cross Appellee,* v. E. F. ADAMS, C. L. KING, A. B. EWING, H. F. FERRY, L. D. HADLEY, C. L. HARRIS, Executor of the Last Will and Testament of T. A. KRAMER, deceased, *Appellees* and *Cross Appellants.*

### No. 27,213.

THE RAMSEY PETROLEUM COMPANY, *Appellant,* v. E. F. ADAMS et al., *Appellees.*

### No. 27,217.

THE RAMSEY PETROLEUM COMPANY, *Appellee,* v. E. F. ADAMS et al., *Appellees* (C. L. KING and H. F. FERRY, *Appellants*).

### No. 27,230.

THE RAMSEY PETROLEUM COMPANY, *Appellee,* v. E. F. ADAMS et al., (L. D. HADLEY), *Appellants.*

#### SYLLABUS BY THE COURT.

1. BANKS AND BANKING—*Reception of Deposits After Knowledge of Insolvency —Liability of Directors—Constitutionality of Act.* The statute (R. S. 9-163, 9-164) which provides, among other things, that any officer or director of any banking institution who shall assent to the reception of deposits after he shall have knowledge that the institution is insolvent or in failing circumstances, considered and held not to violate the due process clause of the federal constitution.

Banks and Banking, 7 C. J. pp. 564 n. 30, 571 n. 21, 573 n. 61; 22 L. R. A. n. s. 266; 3 R. C. L. 491, 497; 26 L. R. A. 1072.

2. SAME—*Reception of Deposits After Knowledge of Insolvency—Liability of Director—Sufficiency of Evidence.* In actions to recover from the officers and directors of a defunct bank the amounts of several deposits, under the statute which provides that any officer or director of a bank who accepts or assents to the reception of deposits by the bank when he knows of its insolvency, the evidence considered and held sufficient to sustain a general verdict which included a finding that the bank was insolvent and in a failing condition at the time the deposits were received.

3. SAME—*Liability of Directors—Incapacity as Defense.* A special defense that a director who had served as such for several years was incapacitated from attending to business and therefore not liable, considered and held to be unavailing.

4. SAME—*Liability of Directors—Conduct of Bank Commissioner as Defense.* And further, it was no defense that the bank commissioner and his deputies visited the bank from time to time, made investigation and inquiry into the condition of the bank's affairs and with knowledge of its condition permitted the bank to operate.

5. SAME — *Liability of Director — Person Wrongfully Carried in Reports as Director.* A, who had previously been a director of the bank ceased to be a stockholder November 16, 1920, and was replaced on the board of directors by another January 4, 1921. The deposits in question were made during the month of March, 1923, and the bank closed the 30th of that month. *Held,* A was not liable under the provisions of R. S. 9-163, 9-164, on account of her name being carried in certain bank reports, directories and registers as an officer or director of the defunct bank during two or three years after she ceased to be a director.

6. SAME—*Trial Generally.* Various alleged errors considered and held not to be of substantial merit.

Appeal from Butler district court; ALLISON T. AYRES, judge. Opinion filed February 12, 1927. Affirmed in part and reversed in part.

*John J. Jones,* of Chanute, *B. R. Leydig* and *K. M. Geddes,* both of El Dorado, for G. L. Ramsey and The Ramsey Petroleum Company; *C. A. Leland* and *L. J. Bond,* both of El Dorado, for appellant L. D. Hadley.

*C. L. Harris,* of El Dorado, *Bennett R. Wheeler, S. M. Brewster* and *John L. Hunt,* all of Topeka, for appellee C. L. Harris, executor of the estate of T. A. Kramer, deceased; *J. B. McKay,* of El Dorado, for appellants C. L. King and H. F. Ferry, and appellee E. F. Adams.

*Ed T. Hackney,* of Wellington, *W. E. Pepperall, C. C. Davidson, Benj. F. Hegler, A. V. Roberts* and *Austin M. Cowan,* all of Wichita, as *amici curiæ.*

The opinion of the court was delivered by

HOPKINS, J.: These were actions to recover from the officers and directors of a defunct bank the amounts of several deposits, under

Ramsey v. Adams.

the statute which provides, among other things, that any officer or director of a bank who receives or assents to the reception of deposits by it when he knows it is insolvent or in a failing condition is liable therefor. (R. S. 9-163, 9-164.) The question of the constitutionality of this statute was considered in some of the same cases on a previous hearing. (*Ramsey Petroleum Company v. Adams,* 119 Kan. 844, 241 Pac. 433.)

The facts, briefly, are these: The Butler County State Bank was organized in 1909 by J. B. Adams, who was its principal stockholder and managing officer. Mr. Adams died in 1921 while an examination of the bank was in progress. Previous to his death the bank had some heavy excess loans. Its general condition, which was not good, did not improve, and on March 30, 1923, it was closed by the bank commissioner. The defendants, except Mrs. E. F. Adams, were officers and directors of the bank at the time it was closed. The plaintiffs were depositors therein.

Trial resulted in judgment against all of the defendants except Mrs. Adams, George W. Lyon, and C. L. Harris, as executor of the estate of T. A. Kramer, deceased. Demurrers to the evidence were sustained on behalf of Mrs. Adams and Lyon. Verdict was returned for Harris and judgment rendered thereon. The plaintiffs appeal from the judgment sustaining the demurrer of the defendant Adams and from the judgment in favor of the defendant Harris. The defendants against whom judgment was rendered also appeal.

The defendants again question the constitutionality of the statute under which the proceedings were brought. They maintain that the statute is void in that it deprives them of property without due process of law. The question was given serious consideration on the former hearing and need not now be treated at length. A contention that the statute is analogous to a Wisconsin statute considered by the supreme court of the United States in *Schlesinger v. State of Wisconsin,* 270 U. S. 230; 46 Supt. Ct. Rep. 260; 70 L. Ed. 301, may be briefly noticed. The statute of Wisconsin to which reference is made provided that any transfer of any substantial part of a grantor's property within six years prior to his death without an adequate consideration should be construed to have been made in contemplation of death and subject to the inheritance tax. In the Schlesinger case the decedent made a transfer of some five million dollars of his property, or substantially all of his estate,

Ramsey v. Adams.

to relatives within from two to four years of his death. A tax was imposed upon his estate upon these gifts. The lower court found that actually the testator did not make the transfers in contemplation of death, but that the statute raised a conclusive presumption that he did. On appeal the case was affirmed by the supreme court of Wisconsin, but was reversed by the supreme court of the United States. In the opinion by the latter, it was said:

"The challenged enactment plainly undertakes to raise a conclusive presumption that all material gifts within six years of death were made in anticipation of it and to lay a graduated inheritance tax upon them without regard to the actual intent. The presumption is declared to be conclusive and cannot be overcome by evidence. It is no mere *prima facie* presumption of fact."

The Wisconsin statute is not analogous to ours. Ours does not undertake to raise a conclusive presumption as does the Wisconsin statute. The Wisconsin statute provides no escape from its provisions; ours does. Ours provides a mere *prima facie* presumption of fact which may be overcome by a showing on the part of the director of having examined into the affairs of the bank to know if possible its condition or some other *bona fide* reason that he (the director) was physically or otherwise unable to know its condition. The other provision of our statute which holds the director to have knowledge of the bank's condition because of. his failure to discharge his duties is a declaration of substantive law, *i. e.*, it creates an obligation on the part of the director to do certain things which if done will relieve him of liability to the depositor. It also gives the depositor a right to recover from him if he fails in this regard to do his duty. In *Ramsey Petroleum Company v. Adams*, supra, it was said in the opinion:

"But we cannot agree that the statutory provision under present scrutiny is justly subject to the criticism leveled against it. The provision reads: 'And upon failure of any such person' (officer or director) to discharge such duty (to examine the bank) he shall, for the purpose of this act, be held to have had knowledge of the insolvency of such bank or that it was in failing circumstances.' This is not an arbitrary edict of the legislature making evidence out of facts which are without inherent evidential significance, nor an arbitrary perversion of the rules of evidence. It is rather a statutory declaration of substantive law. We have many such rules of substantive law touching civil liability. Analogous liabilities are imposed by substantive law, even where there is little or no element of actual wrongdoing or negligence on the part of those subjected thereto." (pp. 848, 849.)

In *Orient Insurance Company v. Daggs*, 172 U. S. 557, 43 L. Ed. 552, it was said:

Ramsey v. Adams.

"It is one thing to attribute effect to the convention of parties entered into under the admonition of the law, and another thing to give to circumstances, maybe accidental, conclusive presumption and proof to establish and force a result against property or liberty." (p. 566.)

We conclude that the Schlesinger case is not controlling here and adhere to our former decision that the statute under consideration does not deprive the defendants of property without due process of law.

The plaintiffs contend that they were denied recovery against C. L. Harris as executor of the last will and testament of T. A. Kramer, deceased, on the sole ground of the defense of the physical incapacity of Kramer. Harris contends that the evidence submitted was insufficient to show that the bank was insolvent during the month of March, 1923, the time during which the deposits complained of were accepted; also that Kramer was not liable because he was physically incapable of investigating and knowing the condition of the bank.

Harris maintains that the condition of the bank which ultimately led to its closing was caused primarily by an oil boom which enveloped Butler county some years previous; that farmers who had been hard pressed to earn a living from the land found themselves possessed of large incomes from oil royalties; that the banks of the county were overflowing with money; that the large petroleum producers of the world such as the Standard Oil Company, the Empire Gas and Fuel Company, the Skelly Company and many others made large investments there; that new industries connected with the production of oil were daily coming into the field, and that Butler county was in the midst of a tremendous financial boom; that refineries were being built, factories for the making of things used in the oil fields were being established; that the Santa Fe Railroad Company was constructing a new line from Emporia for the better handling of the freight business; that various new enterprises came into being and money was plentiful; that the financial condition from a practical standpoint required the banks to make excess loans in order to take care of the business. He then argues that with this financial condition existing, the banking department knew of and did not disapprove of the excess loans; that the excess loans were made largely by J. B. Adams; that a representative of the banking department was in El Dorado examining the bank at the time of Adams' death; that the bank commissioner was informed

of the death of Mr. Adams and knew the condition of the bank, but took no steps to close it; that the bank at the time of Mr. Adams' death had deposits subject to check of nearly $1,400,000, and certificates of deposit amounting to almost $400,000, and resources amounting to $2,283,000; that the bank commissioner continued in close touch with the affairs of the bank and knew of the excess loans and overdrafts; that the bank continued to meet the demands of its creditors in the usual customary way and was not believed to be in an insolvent condition or in failing circumstances in July, 1922 (the time when Mr. Kramer went East on account of. ill health). It is contended that there is no proof that its officers and directors at that time knew it to be in failing circumstances or insolvent; that there had been no hint from the bank commissioner to Mr. Kramer in July, 1922, that the bank was insolvent or in failing circumstances; no suggestion that the excess loans were uncollectible nor a suggestion to Mr. Kramer that the bank should close its doors. It is contended with much vigor that there was no testimony showing that the bank was insolvent at or during the time of the receipt of the deposits in question; that there was no proof that the bank was insolvent when Mr. Kramer went away, no claim that he had not performed his full duty as a director as required by the statute, and that from the date he was stricken in Boston, shortly after he left El Dorado in July, 1922, to the date of his death in July, 1923, he was incapacitated, and by reason of his physical and mental disability unable to make any examination into the affairs of the bank or pay any attention to its affairs. Harris sums up the evidence of Kramer's incapacity as follows:

"The testimony that Kramer was away; that he was sick; that he was unable to examine the books of the bank; that the doctors would not permit him to attend to business; that his mind was dulled by toxins and by opiates; that his physical condition was such that he could not direct his mind toward business affairs, and that outside of the sending to him of the oath of office, he had absolutely no communication with any director or officer of the bank in reference to bank matters, establishes beyond any controversy that so far as actual knowledge of the condition of the bank was concerned he had no information in reference to the condition of the bank other than what he may have possessed at the time when he left."

While giving full consideration to all that is shown and argued in behalf of Mr. Kramer, we are compelled also to give due consideration to admitted facts shown by the record which rendered him liable as a director and which necessarily carries such liability

Ramsey v. Adams.

to his executor. There was evidence that Mr. Kramer on August 28, 1920, joined with certain other directors in making a financial statement of the condition of the bank. This statement disclosed five of the principal excess loans which it is claimed had largely to do with the ultimate failure of the bank; that on March 5, 1921, he signed another financial statement which was sent to the bank commissioner, disclosing the same excess loans and others; that December 31, 1921, March 18, 1922, and June 6, 1922, he signed other financial statements which were sent to the bank commissioner showing the condition of the bank as of the date of each statement; that each succeeding statement showed the excess loans above mentioned and many others that were in the bank at the time it closed; that Mr. Kramer attended the quarterly meeting of the board of directors of the bank January 10, 1921, and signed a written report sent to the bank commissioner, showing the excess loans above mentioned, the amount of each and many others; that he attended quarterly meetings of the board of directors in July, 1921, January 5, 1922, April 7, 1922, and July 6, 1922, each time signing a report to the bank commissioner, reflecting the condition of the bank; that the excess loans April 7, 1922, amounted approximately to $774,000; July 6, 1922, $771,000; that the statements sent to the bank commissioner and the reports of the proceedings of the quarterly meetings of the directors referred to bear his signature as a director of the bank. There was evidence that the bank was examined by a deputy bank examiner in September, 1921. The report which he transmitted to the bank commissioner, which was signed by Mr. Kramer, listed and specifically named excess loans aggregating $820,000. In this statement, the deputy bank examiner made a requirement under the head of "Notice to Officers," which reads:

"REQUIREMENTS.

"Second: Excess loans amounting to $820,128.91 are held by your bank in violation of the banking laws. You are hereby notified to reduce said loans to the legal limit within sixty days from the date hereof.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"These excess loans are of long standing and must be reduced to the legal limit. Any that are not within the limit by January 10, 1922, must be charged out of the bank.

"See attached sheet for further requirements, the same being as though written hereon.

"Dated September 17, 1921. By order of the bank commissioner of Kansas.

H. E. WRIGHT, *Deputy Bank Commissioner.*

C. S. BOWMAN.

"We acknowledge receipt of the notice to officers and directors, of which the above is a true copy, and we hereby agree to comply with the terms thereof and to notify the bank commissioner when the same has been done.

"C. L. KING, *President.*
"A. B. EWING, *Cashier.*
"L. D. HADLEY, T. A. KRAMER, C. L. KING, A. B. EWING, H. F. FERRY, *Directors."*

Additional requirements made at the same time were:

"Under no condition make further excess loans and do not increase any present excess. Make no transfers of stock until permission is secured from the department. Your draft list is excessive both as to number of items and as to total."

The same deputy again examined the bank in January, 1922, and transmitted to the bank commissioner a report signed by Mr. Kramer listing in detail approximately the same excess loans, to the amount of $782,000. This report, acknowledged by Mr. Kramer, contained these statements:

"Seventeen excess loans amounting to $782,585.69 are held by your bank in violation of the banking laws. You are hereby notified to reduce said loans to the legal limit within sixty days from the date hereof.

. . . . . . . . . . . .

"Fourth: Your overdrafts are too large, too many, and of too long standing, charge off those of long standing and keep out chronics.

"Fifth: Your Other Real Estate account contains items carried in violation of the law. Attend to this as soon as possible.

"Sixth: Your loans are short. Put in balance as soon as possible.

. . . . . . . . . . . .

"Ninth: Your Other Bonds account contains items that are not legal investments for a state bank. Correct this.

. . . . . . . . . . . .

"We hereby acknowledge receipt of the notice to officers and directors of which the above is a true copy, and we do hereby agree to comply with the terms thereof and to notify the bank commissioner when the same has been done.

"C. L. KING, *President.*
"H. F. FERRY, *Cashier,*
"L. D. HADLEY, C. L. KING, H. F. FERRY, A. B. EWING, T. A. KRAMER, *Directors."*

The evidence indicates clearly that Mr. Kramer was personally familiar with the condition of the bank from the first of the year, 1921, to the time he attended the last meeting of the board of directors in July, 1922. It is admitted that when he left El Dorado some days thereafter on his eastern trip, he knew the condition of the bank. The same condition was reflected when the bank was closed March 30, 1923. It had not changed. The same overdrafts

were there; the same unpaid notes; the same excess loans.  Mr. Kramer had for years been attorney for the bank.  He was reputed a lawyer of marked ability.  He must have known the condition of the bank during all of the time mentioned, and it may be observed in passing that because of his marked ability and general reputation his responsibility was the greater.  Depositors, no doubt, had greater confidence in the bank because of his being a director.  But it is argued that, "from the date he was stricken in Boston in August, 1922, until the date of his death, in July, 1923, he was incapacitated and by reason of his physical and mental disability unable to make any examination into the affairs of the bank or to pay any attention to its affairs."  Two things appear clear.  The bank's condition had not changed, and it is apparent that he did keep in touch with its affairs, because on January 20, 1923, two months before the bank was closed, he signed the oath of the director, placed in the proper blank in his own handwriting his street address and post-office address, swore to it before a notary public and sent it to the bank commissioner.  It was filed in the bank commissioner's office only thirteen days later than the oath of his codirectors who had been elected at the same meeting.

The evidence shows no substantial change in the bank's condition from the time Mr. Kramer left El Dorado until the time the bank closed.  It is not unreasonable to conclude from the evidence that the bank was insolvent when he left in July, 1922; insolvent when he again took oath as director in January following, and insolvent when it closed at the end of March.  He must have known the bank was insolvent when he took the oath as director in January, 1923.  He knew that it was being kept open all of this time and that deposits were being received.  There was evidence that the bank's condition was sufficiently serious in 1921 that the levy of an assessment of 50 per cent on the stockholders was required within ten days after an examination by the banking department.  The reports showing the kind and character of the various loans, the security given, the date when the paper was made, the date of its maturity, whether it was of long standing or otherwise, and whether the general indebtedness was of an increasing character, showing when the security was exhausted and applied to the liquidation of the debts and evidence showing that in some cases the receiver was able to collect only fifty per cent of the indebtedness, was all competent as showing

the insolvent condition of the bank. The contention that there was no evidence showing that the bank was insolvent or in failing circumstances cannot be sustained.

The jury returned the following special verdict:

"We, the jury empaneled and sworn in the above entitled cause, do upon our oath find for the defendant, C. L. Harris, executor of the estate of T. A. Kramer, deceased, not liable on account of said T. A. Kramer being physically unfit to know the conditions of The Butler County State Bank at the time the deposits were made by the plaintiff that are now in controversy."

It is contended by the plaintiffs that this verdict was induced by the attitude of the court and the instructions given. The instructions complained of read:

#### 4-A.

"This defendant further alleges that on the —— day of August, 1918, the said T. A. Kramer, while living in the state of California, was taken sick and compelled to undergo a severe surgical operation, from which he never fully recovered; that on the —— day of May, 1920, he returned to El Dorado, Kansas, where he again underwent a serious abdominal operation, on account of which he was unable to attend to any business and from which he never fully recovered; that about the 10th day of July, 1922, he left El Dorado for the purpose of rest and recuperation, and on August 15, 1922, in the city of Boston, Mass., he was again compelled to undergo a severe operation; that in November, 1922, he was removed to East St. Louis, where in December another operation was performed on him, and his condition gradually grew worse until the date of his death, July 23, 1923; that from the time of his first operation until the day of his death he was unable to attend to any business of importance; that by reason of his condition, he was unable to return to El Dorado at any time after his operation in Boston on August 16, 1922; that his suffering was so intense and his physical condition of such a character that it was impossible for him to direct his mind for any length of time to any business matter or give any attention to business affairs; that by reason of these facts and circumstances, it was impossible for him to give any attention to the affairs of The Butler County State Bank, and during all of said period he had no access to the books and records of said bank and was in no condition, physically or mentally, to make any examination of the business or condition of said bank, and it was impossible for him to assent to the acceptance of any deposits in said bank; that during all of said period he was constantly attended by his relatives who, acting under the advice of his physician, kept all business matters from him as far as possible; that it was impossible for him to give any serious attention or consideration to business matters without seriously injuring his health and shortening his life."

#### 22.

"The defendant Harris, as executor of the estate of T. A. Kramer, deceased, interposes the defense that the said Kramer for many months prior to the

Ramsey v. Adams.

closing of said bank was absent from Butler county, Kansas, on account of sickness and was unable to return to said county, or to exercise any control over the affairs of the Butler County State Bank, or to in any way examine into its affairs, or control, or direct its management; and in this connection you are instructed that the burden of proof is upon the said defendant to establish this defense by a preponderance of the evidence. That is, the defendant Harris must prove by a preponderance the fact that the said Kramer was, under conditions and .circumstances which he could not control; detained from Butler county, on account of sickness, and was not on account of such sickness able to return to said county, and was not, thereby, able to be present and know as to the condition and management of said bank and to give his assistance and advice in the management and control of the same."

23.

"You are instructed that if you believe from the evidence in this case that the said T. A. Kramer was at the time said deposits were made, and had been for some time prior thereto, in a condition of health that made it impossible for him, on account of his mental or physical condition, to make an examination into the affairs of said bank, and if you find that he was a director of said bank at the time of the reception of such deposits, then before he can be held liable under the statute for such deposits, it must be shown by a preponderance of the evidence that he had knowledge of the reception of the deposits in question, and with such .knowledge assented to the making of such deposits, and in considering whether such knowledge and assent was had by the said T. A. Kramer, you are not to take into consideration the fact that he failed to make the examination of said The Butler County State Bank as required by law, if you find as a fact that he was at such time unable, because of his physical or mental condition, to make such examinations."

24.

"And you are instructed that if you believe from the evidence that the said T. A. Kramer was in the condition described in Instruction No. 4-A, above set out, and was by reason of such condition unable to give any attention to the affairs of said The Butler County State Bank, and was in no condition physically or mentally to make any examination into the business or the condition of said bank, then, and in that event, as a matter of law, he would not be required to make any examination and is not chargeable for any failure so to do."

25.

"You are instructed that if you believe that the said T. A. Kramer was in the condition set out in the Instruction No. 4-A above, and that acting under the advice of his physicians, all matters of business were kept from him, in order that his health might not be injured by attention to such business, then you are instructed that it would not be incumbent upon him to make the examinations required in section 9-163 of the Revised Statutes of 1923, heretobefore quoted, and he could not be held to have given his assent to the reception of such deposits, unless the plaintiff in this case has shown

by a preponderance of the evidence that he had actual personal knowledge of the making of the deposits herein and that he actually authorized such deposits to be received or that he actually assented to the reception of such deposits."

It is perfectly apparent that Mr. Kramer's illness was neither sudden nor temporary, and that the verdict must have been influenced by the quoted instructions. Mr. Kramer was suffering in 1918 with the same disease that finally caused his death, yet he continued to attend to its business, to accept the privileges, the benefits, the honor and the emoluments of the office of a director.

A director of a bank like the one here under consideration, knowing that it has for years during his directorate carried excess loans of from $650,000 to $820,000, acknowledging time after time that it was operating in violation of law and necessarily knowing that it is insolvent, cannot be heard to say that by reason of his physical condition, he did not know its condition. He knew and necessarily assented to the reception of the deposits and thereby incurred the liability that the statute imposes on him. *Briggs v. Spaulding*, 141 U. S. 132, 35 L. Ed., 662, is cited and relied on by Harris as sustaining his contention of nonliability. There one officer of the bank was given a leave of absence, went away and died before the expiration of the leave of absence. The court held that it was within the power of the board of directors of the bank to grant a leave of absence, and that the director could not be held liable for the things that occurred in the bank in his absence which caused the insolvency. Two other directors who were newly elected to the board approximately ninety days before the insolvency of the bank, were relieved from responsibility because no different condition existed in the bank at the time it closed than at the time they became members of the board. A vice president and director was relieved from liability, having been elected in May, 1881, and being an invalid at the time of his election and unable to transact business, the bank having closed its doors in the early part of 1882. This case is distinguished in *Rankin v. Cooper*, 149 Fed. 1011; where it was said:

"The mere fact that a director of a national bank does not attend to his duties by reason of continued ill health or other business engagements does not necessarily relieve him from liability for losses sustained by the bank through the failure of the directors to exercise proper care and supervision over its affairs." (Syl.)

In the opinion it was stated:

"A special defense is set up by the executor of Logan H. Roots, deceased, on account of ill health and absence from the city, and in that connection, *Briggs v. Spaulding,* 141 U. S. 132, 11 Sup. Ct., 924, 35, L. Ed., 662, has been referred to. I think a passing illness, temporary in character, is an excuse for the period it lasts, but, if a person becomes a confirmed invalid for a number of years, and unable to attend to the duties of a director, he has no right to hold on to the position and at the same time decline its corresponding responsibilities. By doing so he invites others to trust the bank on the strength of his name, and in such case he ought to bear his share of the consequences growing out of such a dual situation. This is peculiarly applicable to Colonel Roots because of his high reputation in the community and the great trust that was placed in him as a director, as abundantly appears from the evidence in this case. Nor does it appear from the evidence that Colonel Roots was in fact such an invalid that he could not give any attention to the affairs of the bank. On the contrary, it appears that he attended 46 meetings in 1890; 38 in 1891; 48 in 1892, and 9 in January, 1893. He also in writing indorsed and approved the report of the examining committee of November 25, 1891, signed the letter to the comptroller of January 16, 1892, was reëlected and accepted the office of president in January, 1893, and accepted the office of receiver for this bank when it closed. Defendant Blass in his testimony, says:

" 'Logan H. Roots attended the board meetings whenever he was in the city. Being an old bank man, he was counseled in all matters of the bank by myself and directors. He had access to the books and papers of the bank at all times as a director.' " (p. 1016.)

In construing the statutory liability of directors of national banks, it has been said:

"The statutory liability of directors of national banks as provided in section 5239, is undoubtedly the exclusive rule by which to measure the right to recover damages from directors based upon a loss alleged to have resulted solely from violation by such directors of a duty expressly imposed upon him by provision of the national banking act." (*McCormick v. King,* 241 Fed. 737, 743. See, also, *Savings Bank v. Wulfekuhler,* 19 Kan. 60; *Yates v. Jones National Bank,* 206 U. S. 158, 27 Sup. Ct. Rep. 638, 51 L. Ed. 1002; *Thomas v. Taylor,* 224 U. S. 73, 32 Sup. Ct. Rep. 403, 56 L. Ed. 673; *Bowerman v. Hamner, as Receiver,* 250 U. S. 504, 63 L. Ed. 1113; *Williams v. Brady,* 221 Fed. 118; *Williams v. Brady,* 232 Fed. 740; 1 Morse on Banks and Banking, 5 ed. 272.)

Various other questions discussed in the briefs need not be treated at length. The plaintiffs complain of the ruling of the trial court in sustaining a demurrer to the evidence against Mrs. E. F. Adams. Mrs. Adams had previously been a director. On November 16, 1920, she ceased to be a stockholder and on January 4, 1921,

she was replaced as a director by L. D. Hadley. She was never reëlected to the board and held no office in connection with the bank for more than two years before its failure. It was, however, shown that her name was carried as vice president in Rand-McNally's Bank Directory and the Banker's Registry for July, 1922; that her name also appeared as director in some other directories and on some of the bank's stationery. The contention is that she held herself out as an officer and director of the bank and is liable therefor. In view of the fact that she was not a director and had not been a stockholder for more than two years, the contention cannot be sustained.

It is contended on the part of the defendant Hadley, that while he discussed the condition of the bank with the other directors, that he did not at any time know the condition of the bank was dangerous and at all times believed that the slow paper would be collected. Mr. Hadley became connected with the bank in 1914 as a bookkeeper. He became a director of the bank in January, 1921, and so remained until its close March 30, 1923. What has heretofore been said necessarily disposes of his contention.

Various other questions raised by the defendants have been given consideration, but we find nothing which would justify a reversal of the judgment against them.

The judgment in favor of C. L. Harris as executor of the estate of T. A. Kramer, deceased, is reversed and remanded with instructions to render judgment for plaintiffs. Otherwise it is affirmed.

BURCH, J., dissenting.

HARVEY, J. (concurring specially): I concur in the result reached, but wish to add this: Illness of a director is not a defense in an action of this kind. The statute does not make it so. In an effort to make state banks safe for depositors and others who place confidence in the integrity and reliability of bank officials, the legislature has designated certain duties and created certain responsibilities and liabilities of officers and directors. I see no reason for interpreting the statute to mean a less duty or a less liability than the statute provides. Illness always creates hardships, sometimes serious ones, but it does not relieve the maker of a promissory note of liability thereon. Neither should it relieve directors and officials of banks from the responsibilities and liabilities imposed by statute

Ramsey v. Adams.

upon them by reason of the office or position which they have voluntarily assumed. Especially is this true when there is nothing in the statute to indicate a legislative intention to relieve such officers and directors from liability for that reason.

DAWSON, J. (dissenting in part): This court makes a clear distinction between the present cases and the Schlesinger case, *supra*. To do so, however, it properly concedes that a director would not be irrevocably bound if he was physically unable to know the bank's condition and unable to discharge his duty to insist on closing the bank because of his knowlèdge of its insolvency. The quotation in the majority opinion from *Orient Insurance Company v. Daggs,* supra, indicates that due significance should be given to the effect of circumstances like long-enduring sickness and progressively developing incapacity such as afflicted T. A. Kramer in the last years of his life. I take it that this court does not intend to say point blank that there was no question for a jury to decide touching Kramer's alleged incapacity and the liability or nonliability of Kramer's estate dependent thereon. The court gives a fair summary of the case made in behalf of Kramer's estate in its quotation from the brief of Harris, the executor. The majority. opinion also makes an elaborate summary of the evidence against Kramer's estate and emphasizes the point that Kramer continued to sign directors' bank reports for a year or two after his alleged incapacity had become serious and chronic. Such a point was properly worked for all it was worth before the jury, yet in view of all the ·other evidence it did not convince the jury of Kramer's physical capacity and consequent responsibility, and I think altogether too much significance is given to it in this appeal. And since we must or do concede that the constitutionality of our statute is dependent upon its being given an interpretation which will fairly justify a distinction between the liability imposed on a bank director under the Kansas statute and such a liability as was sought to be imposed by the Wisconsin statute in the Schlesinger case, it will not do to impose a liability on Kramer's estate regardless of the jury's verdict. The court's decision should be consistent with itself. To avoid running afoul of the federal constitution, we interpret our statute as not precluding a judicial inquiry touching Kramer's physical condition so as to determine his culpability and the possible liability of his estate; but in doing so we collide with a fundamental

principle of appellate review by substituting our judgment for that of the jury and the trial court on the well-defined and conceded issue of fact.

I see no close analogy between the case at bar and *Rankin v. Cooper*, supra, but the decision in that case went no further than to hold that long-continued ill-health "does not *necessarily* relieve" a bank director from liability for his official delinquency. I approve of that doctrine. How should his right to be relieved therefrom be determined? By submitting all the pertinent evidence to the triers of the issue of fact, to be sure. Just as Kramer's executor did in this case. And in the Rankin case, the trier of the fact held: "Nor does it appear from the evidence that Colonel Roots was in fact such an invalid that he could not give any attention to the affairs of the bank." Here the triers of fact found precisely to the contrary as to Kramer's condition. And the majority opinion quotes enough of the testimony to support that finding.

In *Briggs v. Spaulding*, 141 U. S. 132, 35 L. Ed. 662, which was an appeal from a decree dismissing a suit in equity to recover losses by a bank because of alleged neglect of duty on the part of its directors, the special defense of one of the directors, Francis E. Coit, was discussed thus:

"We are not disposed, therefore, to reverse the decree as to defendants Spaulding and Johnson, and although the case of Francis E. Coit was in some aspects different, and particularly in that he was a director for a longer period, we think it should take the same course. He was elected a director May 20, 1881. . . . He was at the time an invalid, and by reason of his infirmity in health unable to transact business, at least with facility. . . . He was reëlected January 10, 1882. The evidence shows that he had for many years been afflicted with rheumatism. . . . While it may be said that Francis E. Coit should not have accepted the position of director, and should not have allowed himself to be reëlected, yet upon this question of passive negligence the rule would be an exceedingly rigorous one which made no allowance for the person charged under such circumstances. And upon the whole we do not feel called upon to question the decision as to him."

I fear the consequences of setting at naught the verdict and finding of the tribunal established by our constitution and statutes for the determination of controverted issues of fact. " 'Twill be recorded for a precedent; and many an error, by the same example, will rush into the state." I therefore dissent from so much of this judgment as sets at naught the jury's verdict touching the non-existence of culpable delinquency on the part of Kramer and the consequent nonliability of his estate.