No. 28,117.

A. A. RICH, *Appellee*, v. C. F. HOUGH, Executor of the Estate of George Muller, Deceased, F. C. SCHAPER, M. L. HOWARD and LEONARD HATTER, *Appellants*.

No. 28,100.

D. M. HARWOOD, *Appellee*, v. C. F. HOUGH, Executor of the Estate of George Muller, Deceased, F. C. SCHAPER, M. L. HOWARD and LEONARD HATTER, *Appellants*.

No. 28,101.

C. P. HATFIELD, *Appellee*, v. C. F. HOUGH, Executor of the Estate of George Muller, Deceased, F. C. SCHAPER, M. L. HOWARD and LEONARD HATTER, *Appellants*.

(269 Pac. 23.)

Opinion filed July 7, 1928.

*Benjamin F. Hegler, A. V. Roberts* and *Roger P. Almond*, all of Wichita, for appellants C. F. Hough et al.; *Chester I. Long, J. D. Houston, Austin M.*

*Cowan, Claude I. Depew, James G. Norton* and *W. E. Stanley,* all of Wichita, for the appellant M. L. Howard.

*H. W. Hart, Glenn Porter, Enos E. Hook, Edward H. Jamison* and *Getto McDonald,* all of Wichita, for the appellees.

The opinion of the court was delivered by

HOPKINS, J.: These are statutory actions against the directors of the Farmers State Bank of Mulvane to recover the amounts of deposits made by the plaintiffs while the bank was alleged to be insolvent. Plaintiffs prevailed and defendants appeal.

The facts are substantially these: The bank's business had been conducted for several years by J. R. Rosecrants, its cashier. The defendants had been directors for many years. The defendant Muller, who was past eighty years of age, died March 19, following the closing of the bank, February 8, 1926. He had been in failing health for two years, and was confined to his house for six months preceding the failure; had not been to the bank during that time. On his death, C. F. Hough was appointed executor of his estate. The defendant Howard was vice president and director, lived near Mulvane, had been a director for fifteen years, and during the same time had been township trustee and assessor of the township, which included a large part of the city of Mulvane. He was engaged, also, in stock raising and farming. Defendant Hatter was engaged in operating a meat market in Mulvane, and had been so engaged for several years. The defendant Schaper was engaged in farming, and in his younger days had for several years been a school-teacher. Each testified substantially to the same effect as to their procedure in examining the affairs of the bank. Meetings of the board were held quarterly before the tenth of the month, ordinarily in the afternoon. At these examinations the cashier, Rosecrants, would bring the minute book and read the minutes of the last meeting. Various books were brought for examination, such as the cash journal, the deposit journal and the note case. The directors would look at the daily cash journal to see the statement of the bank; would take the notes from the note case one by one and discuss the ability of the maker to pay. The cashier would fill out the statement to be sent to the banking department for their signature. The directors made no examination of the register of certificates of deposit or of the other books of the bank. It appears that they very largely took the

word of the cashier that the statements were correct. They did not examine the vault to ascertain if customers had left bonds for safe-keeping. The bank was closed following an examination by the state banking department. There was evidence tending to show that at the time the bank closed $129,000 of certificates of deposit were found which were not on the register of certificates of deposit, and that notes were outstanding which were not in the note case, totaling $185,000. It was claimed that some of these were forgeries. At the time of an examination of the bank in 1923, the loans amounted to $55,000 more than the deposits. The bank examiner who made the examination at that time testified that the reserve was short and that approximately $15,000 of paper was found which was three months overdue. The defendant Schaper had certificates of deposit totaling $4,000 on which he was paid seven per cent interest, through an arrangement between him and the cashier, Rosecrants. These certificates did not appear upon the register of certificates of deposit. Charles Hillbrecht and his wife owned certificates of deposit totaling $1,700. Hillbrecht was the father-in-law of the defendant Hatter. These certificates were not shown on the register of certificates of deposit. The evidence disclosed that if at any time or at any of the meetings of the board of directors examination had been made of the register of certificates of deposit the directors could have ascertained that such certificates were outstanding as a liability and not shown on the books of the bank.

The jury answered special questions in the three cases to the effect that it was reasonably possible for each of the defendants to have examined into the affairs of the bank and to have ascertained and known its condition. In the Rich case they found that the directors at the four regular meetings each year did not make a thorough examination; that defendants failed to perform their duties as required by law in not examining into the affairs of the bank as thoroughly as was reasonably possible at all times subsequent to requirements made by the bank examiners on their examination in 1923; that defendants first had knowledge of the insolvency of the bank after the bank examiner had made his requirements on the examination of October 29, 1923.

It is contended by defendants that there was an honest effort on their part to perform their duties as directors; that the statute does not fix any definite standard by which the performance of their

duties as directors could be measured; that R. S. 9-163 and 9-164 are unconstitutional; that their provisions create a conclusive presumption of knowledge from failure to examine and because a presumption is based upon a presumption.

It is contended that evidence of insolvency was improperly admitted in that a witness (Barnes) was permitted to testify that unregistered certificates of deposit to the amount of $129,000 bore the signatures of J. R. Rosecrants, cashier, and Alma E. Thompson, assistant cashier, and that the same witness was permitted to testify as to the reasonable cash value of notes in the bank at the time they were delivered to him. We cannot sustain the contention. A certificate of deposit, so far as the issuing bank is concerned, is in the nature of a promissory note to pay a certain amount of money at a certain time at a certain rate of interest, and when these certificates were introduced in evidence, the signatures of the bank's officials proven, together with the dates of issuance and date when they were due, they constituted at least *prima facie* valid obligations and liabilities of the bank. It is contended by the defendants that these certificates had not been allowed by the banking department, but it appears that no evidence of that fact was introduced. The defendants made an offer to prove they had not been allowed. The offer was refused, but was not followed up on consideration of the motion for new trial. No error can, therefore, be predicated for refusal of the court to receive it. Nor can the contention that the witness Barnes was not competent to testify be sustained. Without reciting in detail the evidence showing his qualification to express an opinion, we think it was sufficient.

In support of the contention that the statute is unconstitutional, the defendants say:

"Considering first section (R. S. 9-163), which as we contend creates a conclusive presumption of knowledge from the failure to examine, it will be noted that the statute makes only such directors liable as assent to the reception of the deposits with knowledge of the insolvency of the bank. That being true, the plaintiff in such a case is required to prove knowledge of insolvency and assent to the reception of deposits; and want of knowledge and want of assent would, therefore, be complete defenses to such an action. We contend that the legislature cannot say that a bank officer is conclusively presumed to have had such knowledge by reason of his failure to examine the bank. The natural inference to be drawn from the fact that a person has made no investigation of a particular subject is that he knows nothing about the subject. In this instance the statute seeks to reverse the natural order of things by creating

a conclusive presumption that an officer who makes no examination of the bank knows that it is insolvent, if such be the case. The statute gives the officer no opportunity to show that he had no reasonable opportunity to make an investigation, and this court, in construing the statute, held that when no examination is made, it is immaterial that such examination if made would have been futile."

The question was considered adversely to defendant's contention in *Ramsey Petroleum Co. v. Adams*, 119 Kan. 844, 241 Pac. 117, and 122 Kan. 675, 253 Pac. 416. The later case was taken to the supreme court of the United States, where on its consideration that court, among other things, said:

". . . It is said that [R. S. 9-] 163, denies due process of law by creating a conclusive presumption of knowledge from ignorance and by implying that the director knowingly assented to a deposit that he should not have received, of which in fact he knew nothing. As to [R. S. 9-] 164, it is said that facts are made *prima facie* evidence of other facts that they have no rational tendency to prove. The law as construed by the supreme court of Kansas meets its severest test in the cases against the executor of Kramer, because Kramer, although not so ignorant or incapable of knowledge as thought by the court of first instance, was seriously ill at the time of the deposits and seemed to have much to be said in his behalf, if the actual state of his knowledge had any relevancy as an excuse.

"It is said that the liability is founded by the statute upon the director's assent to the deposit, and that when this is the ground the assent cannot be proved by artificial presumptions that have no warrant from experience. But the short answer is that the statute might have made the directors personally liable to depositors in every case, if it had been so minded, and that if it had purported to do so, whoever accepted the office would assume the risk. The statute in short imposed a liability that was less than might have been imposed, and that being so the thing to be considered is the result reached, not the possibly inartificial or clumsy way of reaching it. If, without any mention of assent or presumptions or *prima facie* evidence, the statute had said: Every director of a bank shall be personally liable to depositors for every deposit accepted by the bank after it has become insolvent, all objections would be met by the answer, You took the office on those terms. The statute would be none the worse if it allowed a defense in the single case of the defendants' having made an honest examination and having been led to believe that the bank was solvent. The mention of assent and evidence of knowledge cannot be pressed to conclusions that the statute manifestly does not allow. The conclusions that as construed by the state court it does impose, it imposes, however much it may cut down, the significance of the assent or knowledge to which it refers. As a matter of law, there is nothing new in charging a party with knowledge of what it is his duty to know, in this case the insolvency of the bank, or with assent to deposits that he must expect while the bank's doors remain open. But the essential thing is that

whether in a roundabout or a perfectly natural way the statute has said, if you take the office, you must take the consequences of knowledge, whether you have it or not. In most contracts men take the risk of events over which they have imperfect or no control. The acceptance of a directorship is as voluntary an act as a contract." (*Ferry v. Ramsey*, [U. S.] 72 L. Ed. 560.) ·

While other questions presented have been considered, we feel that further discussion would serve no useful purpose.

The judgment is affirmed.