No. 30,994.

MARY PIROTT and SUSAN PIROTT, *Appellees,* v. J. B. HEINEN, *Appellant.*

(19 P. 2d 723.)

Opinion filed March 11, 1933.

*Charles L. Hunt, Frank C. Baldwin, Charles A. Walsh, Jr.,* all of Concordia, and *R. L. Hamilton,* of Beloit, for the appellant.

*A. E. Crane* and *Kenneth L. Briggs,* both of Topeka, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action founded on the statutory liability of a bank director who assented to the receipt of a deposit when the bank was insolvent or in failing circumstances.

In brief the facts were these: Plaintiffs owned a farm near Cawker City. They authorized defendant Heinen to sell it for them. He did so and deposited the net proceeds, first in a Beloit bank, and later in the Commercial National Bank of Cawker City which was then insolvent and passed into receivership about three weeks later.

Defendant was and for many years had been a director of the Cawker City bank. Until three years prior to the bank failure defendant had resided in Cawker City. Then he moved to Beloit, since which time he seldom attended the quarterly meetings of the board of directors, but he frequently made more or less thorough examinations of the bank independently.

The infirmities which ruined the bank were mainly two: For several years the cashier, Fred J. Buist, had been forging notes of the bank's customers. So cleverly did he do this that only by using a slightly different form of promissory note from the one in common use could he tell which were the forgeries. Of these spurious notes some $53,593.12 were carried in the bank as part of its assets. On the other hand, by removing some of the loose-leaf depositors' ledger accounts and deceitful manipulation of the adding machine Buist had long concealed from the board of directors, and from this defendant, the true status of the total deposits. The bank had $41,000 of deposits in excess of what the bank's accounts submitted to the bank examiner showed them to be. Defendant and the other directors accepted as correct the adding-machine totals, without discovering that the machine had been systematically manipulated to register a total of deposits so grossly at variance with the correct amount.

The cashier, whose cunning in these respects eventually landed him in the penitentiary, was brought back to Mitchell county to give testimony in this action:

"I never told him [defendant] any of the notes in the note case were forged. . . .

"I removed sheets from the ledger showing deposits, but never told the defendant or any of the directors about it. . . . These sheets were not out

all the time. They were not there when the bank was examined. . . . The depositors' sheets are arranged in alphabetical order. These sheets were removed and laid in front of the ledger tray, not in with the index sheets. The bank examiner never found them until I showed them to him at the last examination. That was the day the bank was closed.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"I had these individual depositors' accounts hidden out, or part of them, for four or five years. They were not always the same sheets, as the sheets were changed.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"The way I got forged notes into the assets was if I removed some other notes from the assets·in place of it, I replaced it with the forged note. . . . One could not tell by looking at the bank that there was something wrong about it, not the way I handled it. . . . No one could determine whether I paid it out on that or out on checks to some one else. No one could tell how much specific cash was used. . . . I left them in when the directors were in. They could have found them all right. There wasn't anything to be said about it. . . . If the directors had looked at it and counted it up they would have found it, but I would not class them as experts. An individual depositors' ledger ordinarily consists of anywhere from 500 to 1,500 sheets, according to the size of the bank. They took my adding machine lists; they didn't take my word for it. They didn't add it themselves. The defendant never tried to add it up.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"The adding machine lists submitted to the directors would check against the depositors' ledger. . . . There was submitted to the directors an adding machine list showing the total of all those accounts.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

". . . You understand the manipulation was in the adding machine, . . . It was an add and substract machine, I just substracted enough to make it balance without printing. : . .

"The directors never ran the figures themselves. They took the adding machine lists. . . . They didn't detect what I had done in the figures. It wasn't on the sheet."

There was testimony tending to show that defendant visited the bank quite frequently, every week or oftener; and that he examined some of its affairs rather thoroughly, particularly the note case, and concerned himself about the low reserves of the bank. He testified:

"I . . . never suspected any of [the notes] had been forged . . . I never suspected until the bank was closed that there were or ever had been forged notes in the bank. . . .

"I did not know the date on which regular quarterly meetings were to be held. . . . I made complaints to Buist for his not notifying me of the day when the meetings were to be held. . . .

"I don't think I attended any quarterly meetings in the year 1928, and

only one in 1929. I didn't attend the only meeting in 1930, as I was under a doctor's care. I was over there sometime after the October meeting."

Touching the concealed shortage in the amount of deposits, defendant testified:

"The notes were not the only things I looked at. I looked over the ledger there and saw whether there was any reserve. I did not add up the amount of notes, nor the amount of deposits. I have never added any of them. I took the ledger sheet for it but did not add it. I never personally added them at any time. . . .

". . . I tried to ascertain how much the deposits were in the bank, took the total going down the list, got an exact total. I took what Buist had added up as the deposits, but did not add them up myself.

". . . In addition to other things at these times I took this daily transaction record, which showed the amount of loans and discounts, the capital, surplus, undivided profits, and the amount of individual deposits, and time certificates. I looked through that book to find out what that was. I had no suspicion that the amounts were not correct."

The jury returned a general verdict for plaintiffs and answered special questions, some of which read:

"Q. 6. Was the actual cash market value of the assets of the Commercial State Bank of Cawker City, Kansas, insufficient to pay its liabilities on February 28, 1930? A. Yes.

"Q. 7. Did J. B. Heinen, by himself, make frequent, full, thorough and complete examinations into the affairs of the Commercial State Bank of Cawker City, Kansas, for the year 1929 and the year 1930, up and till February 28, 1930? A. No.

"Q. 10. Did the defendant know either on February 28, 1930, or March 1, 1930, that the bank was insolvent? A. No.

"Q. 12. Did the defendant at any time before the closing of the bank have any knowledge that its books showed less deposits than it actually had? A. No.

"Q. 13. Was it reasonably possible for the defendant to have detected forged paper in the note case? A. No.

"Q. 14. Was it reasonably possible for the defendant to know that the adding machine had been manipulated so as to show less amount of deposits than the bank actually had? A. Yes."

Defendant's motions to set aside the special findings, for judgment on the findings, and for a new trial were overruled; and judgment was entered in favor of plaintiffs.

Defendant appeals, assigning various errors, which will be noted *seriatim*.

1. It is first urged that the trial court erred in overruling defendant's motion to require plaintiffs to state and number their causes of action separately. The petition was formulated partly

on two theories—(1) that defendant had committed a breach of duty in failing to remit the net proceeds of the sale of the farm to plaintiffs as soon as that transaction was completed, and (2) defendant's breach of his statutory duty as director in permitting the bank to receive the deposit of plaintiffs' funds while it was insolvent or in failing circumstances. The first of these theories was abandoned as the lawsuit progressed, but we cannot say that the jury were misled by that issue, since the court instructed the jury as follows:

"16. The plaintiff is seeking to recover in this action from the defendant by reason of the liability of the defendant as a director of the bank, and is not seeking to recover on account of any individual tort or wrong on the part of the defendant."

However, we do think the trial court's general instructions went to needless length and into needless detail touching the sale of the farm and the deposit of plaintiffs' money in the Beloit bank before defendant transferred it to the Cawker City bank.

2. It is next urged that notwithstanding the trial court's specific instruction No. 16, quoted above, the jury were permitted under the instructions to hold defendant liable for causes other than those under which the statutory liability is imposed.

The pertinent statute reads:

"It shall be unlawful for any president, director, manager, cashier, or other officer of any banking institution, to assent to the reception of deposits or the creation of debts by such banking institution, after he shall have had knowledge of the fact that it is insolvent or in failing circumstances; and it is hereby made the duty of every such officer, agent or manager of such banking institution to examine into the affairs of the same, and, if possible, know its condition. And upon failure of any such person to discharge such duty, he shall, for the purpose of this act, be held to have had knowledge of the insolvency of such bank, or that it was in failing circumstances. Every person violating the provisions of this section shall be individually responsible for such deposits so received, and all such debts so contracted: *Provided,* Any director who may have paid more than his share of the liabilities mentioned in this section may have the proper remedy at law against such other persons as shall not have paid their full share of such liabilities." (R. S. 9-163.)

"In all suits brought for the recovery of the amount of any deposits . . . the fact that such banking institution was so insolvent or in failing circumstances at the time of the reception of the deposit charged to have been so received, . . . shall be *prima facie* evidence of such knowledge and assent to such deposit or creation of such debt on the part of such officer, agent or manager so charged therewith." (R. S. 9-164.)

In addition to defining the duty of a bank director under the statutory provisions just quoted, the court gave an instruction (No. 6) formulated from the duties imposed upon a bank director by another section of the statute (R. S. 9-109), the penalty for breach of which is a fine or imprisonment or both. (R. S. 9-137.) It seems to us that while instruction No. 6 would have been a proper statement of law if this were a criminal prosecution, it had no place in this lawsuit, and quite possibly did tend to confuse the jury in this civil action to recover on the statutory liability imposed for breach of R. S. 9-163.

3. It is next contended that there was no evidence to support the jury's special findings 7 and 14. So far as this pertains to finding 7, we cannot assent to this contention. While there was abundant testimony as to the frequency of defendant's partial examinations of the bank, the evidence was far from conclusive—at least a jury might so determine—that his examinations were sufficiently thorough to satisfy the requirement of R. S. 9-163 and thus enable him to avoid the civil liability imposed for breach of that section. And as to finding 14, neither the trial court nor this court should say as a matter of law that the evidence touching the deceitful manipulation of the adding machine and consequent falsification of the amount of deposits was so subtle that it was not reasonably possible for defendant to discover that the discrepancy of $41,000 existed. Counsel expatiate on the well-known accuracy of an adding machine. That, however, is not the point. If the falsity of the totals had actually been caused by some mechanical failure of the machine, probably no jury would hold defendant blameworthy or civilly liable. But the fault was not in the adding machine but in the deceitfulness of the cashier who operated it. This statute (R. S. 9-163) was enacted many years before the invention of the adding machine. And when enacted it must have been contemplated that depositors' accounts should be carefully checked and added by bank directors to ascertain the true status of the bank's liabilities and likewise to ascertain if the bank's assets were sufficiently intact to meet those liabilities—in short, "If possible, to know its condition." In *Forbes v. Mohr*, 69 Kan. 342, 76 Pac. 403, which, like the case at bar, was an action to recover from bank directors for their illegal assent to the reception of deposits while the bank was insolvent, it was held (among other matters) that a director of an insolvent bank was not excused from liability to a depositor under

this identical statute because he relied upon the supposed honesty of the cashier. Counsel for defendant cite *Scott's Executors v. Young*, 231 Ky. 577, where bank directors were exonerated from their failure to discover certain long-continued defalcations of a bank employee concealed by manipulating a bookkeeping machine. That court said:

"Though Mr. Escott [witness] says that it could have been discovered by a complete audit made by an expert accountant, this practice is not followed by country banks, and, in view of the examination made by them and the state bank examiners, and of the further fact that there was nothing in the conduct or habits of Vardaman [the delinquent employee] reasonably calculated to arouse their suspicion, we are not disposed to hold that the directors were guilty of negligence in failing to have such an audit made. Furthermore, it must not be overlooked that the directors and officers were themselves among the largest stockholders of the bank, and had their own interests to protect, as well as that of the other stockholders. Looking at the case from every angle, we are inclined to agree with the chancellor that the loss occasioned by the Vardaman shortage was not due to a failure on the part of the officers and directors to exercise ordinary care in the management and supervision of the bank." (p. 583.)

However, this court has long held bank directors to a more exacting standard of duty. In *Forbes v. Mohr*, supra, it was said:

"It was evidently the thought and purpose of the legislature to guard depositors from loss through the incompetency or criminality of officers chosen by directors by imposing upon such directors the burden of giving watchful care to the affairs of the bank, and by adding to their duties something more than care in the selection of president and cashier, to wit, the duty of keeping watch of their conduct by making an examination into the affairs of the bank with reasonable frequency and thoroughness. . . . A director may not excuse himself from liability to a depositor by saying that he was relying upon the honesty of the cashier whom he had employed, and hence made no examination of the affairs of the bank; or that it would have been useless for him to make such examination because the peculations of the cashier were of such character, and carried on and concealed with so skillful a hand, that he, not being an expect, could not have discovered them." (pp. 346, 348.)

In our opinion it would not do to say that while bank directors cannot escape responsibility by putting dependence on the assumed honesty of the bank cashier they are excusable for putting dependence on the assumption that he honestly operated the bank's adding machine. However a jury might regard the question, it cannot be said as a matter of law that defendant could implicitly rely on the cashier's honesty in the operation of the adding machine, especially when his deceitful manipulation of it had extended over

a period of several years. The evidence, which included all the circumstances, was sufficient to justify the jury's answers to questions 7 and 14.

4. It is next contended that defendant was entitled to judgment on the special findings. This argument is based on the finding that defendant did not know of the existence of $53,000 worth of forged paper in the bank's assets. That finding of fact, while helpful to defendant, did not completely exculpate him. It is far from clear that a thorough examination of the bank's condition at reasonable intervals would not have disclosed corresponding infirmities in the bank's accounts necessitated by the long continued existence of this vast amount of forged paper in the assets of a village bank like that of Cawker City. The placing of each forged note in the assets would necessitate some corresponding entry of diminished cash, or some additional item of deposits to the credit of the person whose name was thus forged, or in some other manner the sum of the forged instruments would necessarily appear. That such systematic falsification of the bank's assets and liabilities could continue for years without defendant discovering it is rather difficult to believe, and even if it was not reasonably possible for defendant to have detected the forged instruments in the note case (finding 13), that fact did not exonerate him of all negligence in discharge of his duty. under R. S. 9-163. It must be held that defendant was not entitled to judgment on the jury's special findings.

5. Defendant does present a meritorious complaint against some of the instructions. Instruction No. 10 dealt with the liability of a director who has failed to make any examination of the bank's affairs. Since there was no evidence of such utter failure to make any examination, this instruction was irrelevant if not altogether prejudicial.

6. A still graver objection is properly urged against instruction No. 4, which was as follows:

"4. Directors of a bank are presumed to know the financial condition of the bank, its general business as shown by the regular books and receipts and expenditures, and that is for the protection of the parties dealing with the bank. You are therefore instructed that J. B. Heinen conclusively is presumed to know what the records of the bank disclosed on March 1, 1930, or any other time when he was director of said bank."

Neither the pertinent statute under which this action was predicated and as stated in instruction No. 16, quoted above, nor anything hitherto declared in our precedents, will support the rule of

law stated in instruction No. 4. Certainly the Butler county bank cases, *Ramsey Petroleum Co. v. Adams*, 119 Kan. 844, 241 Pac. 433, and *Ramsey v. Adams*, 122 Kan. 675, 253 Pac. 416, cited by both parties, do not support such a rule. In the first of those the relevant point dealt with facts which constituted *prima facie* evidence of bank directors' neglect of duty. *Prima facie* evidence is quite a different thing from *conclusive* evidence, or a *conclusive* presumption. In the second of those cases the *conclusive* presumption of the bank director's knowledge of the bank's insolvent condition was invoked, because director Kramer had failed to make any examination of the bank. See *Ferry v. Ramsey*, 277 U. S. 88. Nothing in the evidence for plaintiff, given its largest credence, furnished any basis for a conclusive presumption that defendant knew or that he "conclusively is presumed to know" what the bank records disclosed on March 1, 1930, or at the time plaintiffs' money was deposited in the bank. Instruction No. 4 was erroneous and prejudicial.

7. Appellant also complains because of the trial court's refusal to give instructions to the jury as requested in several particulars. One of those refused would have told the jury that defendant would not be liable although he failed to attend the regular quarterly meetings of the board of directors if at other times he made frequent and thorough examinations of the bank. Instruction No. 7, which the court did give, and other pertinent instructions sufficiently covered this feature of the case. Another instruction requested and refused dealt with the question of defendant's liability in so far as the insolvency of the bank was caused by the large amount of forged notes in its assets. That point was sufficiently covered in the instructions given. We have already noted the trial court's refusal to require plaintiffs to separately state and number their causes of action; and while the court did give instruction No. 16, quoted above, it would seem but just to have given defendant's requested instruction No. 4, since the court's general instructions extended to several pages, narrating at length the utterly inconsequential details of the sale of plaintiffs' farm and of defendant's unauthorized disposition of the proceeds in the Beloit bank, before transferring them to the Cawker City bank. Granting that defendant's conduct in that respect was unauthorized, even reprehensive, it was not what he did with the money as agent of plaintiffs that subjected him to possible liability in this action, but his delinquency as director of the bank in permitting it to accept plain-

tiffs' money while it was insolvent. The needlessly lengthy general instructions were so likely to plant in the minds of the jury an unfavorable impression of defendant's conduct in handling plaintiffs' affairs that something like defendant's requested instruction No. 4 should have been given to avoid the probability of the jury's being led astray.

8. Complaint is made against the rulings which excluded evidence in defendant's behalf. He offered to show the reason why he so frequently failed to attend the regular quarterly meetings of the board of directors. Under the majority view in *Ramsey v. Adams*, supra, as affirmed in *Ferry v. Ramsey*, 277 U. S. 88, it was of no consequence why defendant failed to attend those directors' meetings. Moreover, we must repeat, defendant's liability did not turn on his breach of duty to attend the quarterly meetings or to perform any other duties prescribed in R. S. 9-109, but because of alleged breach of duty imposed by R. S. 9-163.

9. Other excluded evidence was that of other directors of the bank who did attend the directors' meetings. Their testimony would have shown that they did not discover the forged notes nor the manipulation of the adding machine which falsified the amount of deposits. We cannot say that the exclusion of this evidence was erroneous. It would have been quite proper, of course, to show the correct way a bank director should examine a bank, so the jury could determine how closely defendant's examinations conformed to good practice; or defendant might have produced experienced bank directors and have propounded a hypothetical question to them touching defendant's view of what the evidence showed concerning the extent and frequency of defendant's method of examining the bank, and thus have elicited their expert opinion whether such measure of thoroughness and frequency would have made it reasonably possible for defendant to have discovered the bank's insolvent condition. (*Shouse v. Consolidated Flour Mills Co.*, 132 Kan. 108, 294 Pac. 657.)

The foregoing concludes our review of the matters most urgently pressed on our attention in this appeal. Because of the manifest error in instruction No. 4, which will necessitate a new trial, we have gone into some of the other errors assigned with greater detail, not because in themselves, separately considered, they would necessarily constitute reversible error, but to contribute what we may to their avoidance in another trial.

The judgment is reversed, and a new trial is ordered.